In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00041-CV


______________________________




DILLARD DEPARTMENT STORES, INC., Appellant



V.



LYNDON SILVA, Appellee




 


On Appeal from the 189th Judicial District Court


Harris County, Texas


Trial Court No. 98-27760




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Justice Ross


Dissenting Opinion by Justice Carter



O P I N I O N



 Dillard Department Stores, Inc. accused Lyndon Silva of shoplifting from its Town
and Country Mall location in Houston. Silva was tried in criminal court for theft charges
stemming from this incident and was found not guilty. After his acquittal, Silva brought a
civil action against Dillard, alleging false imprisonment, malicious prosecution, intentional
infliction of emotional distress, and negligence. A jury found Dillard liable for all the
allegations brought by Silva, except malicious prosecution, and awarded Silva past and
future damages of $10,124.01 and $3,000.00, respectively, and punitive damages of
$50,000.00. Dillard contends the trial court erred in denying its motion for judgment
notwithstanding the verdict or, alternatively, its motion for new trial, because there was no
evidence or factually insufficient evidence to support the jury's findings of false
imprisonment, intentional infliction of emotional distress, or negligence. Dillard also
contends the trial court erred in denying these motions because there was no evidence or
factually insufficient evidence to support the jury's actual and punitive damage awards.

 Silva was a hairstylist and testified that, while working at his place of employment,
he received three shirts as a gift from a customer who has since returned to her native
country. He explained that, because he and his roommate liked to dress alike, two of the
three shirts were the same. Silva further testified he had his picture taken with the shirts
at the salon where he worked. This picture was shown to the jury. 

 On June 12, 1997, Silva went to the Town and Country Mall in Houston, where one
of his friends was opening a new hair salon. Silva also took the three shirts, because he
and his roommate had decided to exchange them. After touring the new salon, Silva went
to his car, retrieved the three shirts, and went to Dillard. Silva testified the customer who
had given him the shirts had also given him the receipt with the gift, in case he wanted to
exchange them.

 Silva first attempted to return the shirts at the cosmetics/accessories counter, but
was told he needed to exchange them at another department. While at the
cosmetics/accessories counter, Silva purchased a back brush; the receipt indicated this
purchase was made at 1:06 p.m. At 1:27 p.m., Silva purchased a Tommy Hilfiger shirt,
making him eligible to purchase a Tommy Hilfiger travel bag being used as a promotional
item. Another receipt indicated he purchased this travel bag at 1:31 p.m. 

 Silva testified he began to experience a headache and asked directions to the water
fountain so he could take some medicine. According to Silva, a Dillard security guard,
Kevin Rivera, stopped him while Silva was on his way to the water fountain. Rivera was
an off-duty Houston police officer who was in uniform, with his "gun on [his] hip." Silva
testified Rivera accused him of theft and placed him on the floor and handcuffed him. Silva
said the officer emptied Silva's shopping bag onto the floor. Silva told the officer he had
receipts for the items, including the three shirts. When the receipt for the shirts was not
found in the bag, Silva said he begged the officer to go outside and check his car for the
receipt. The officer instead took Silva, while handcuffed, up the escalator to an empty
office. Silva said there were a lot of people watching. He also testified that no one asked
him for an explanation and that, while in the office, the officer and a woman made fun of
him. He stated that, when the city police arrived to take him into custody, Rivera again
placed him on the floor with his knee in his back, and exchanged handcuffs with the city
police. Silva said there were onlookers lined up to watch when he was escorted back
downstairs and taken to the waiting police car. 

 Silva later produced a receipt for three shirts purchased at Dillard June 2, 1997. All
three shirts were the same style and price as the three Silva was accused of stealing. 
However, two of the SKU numbers did not match exactly those written on Dillard's internal
report about the incident. (1) Silva's explanations of these discrepancies between the SKU
numbers included a difference in sizes (delineated by the end numbers of the SKU
numbers), a sales clerk scanning one item multiple times instead of scanning the individual
tags on similar items, and a misidentification of the merchandise. 

 The testimony of a Dillard's sales associate, Karen Wallace, was very different from 
Silva's. Wallace testified that, around 1:30 or 1:45 p.m. on the day in question, she noticed
Silva and felt he was watching her more than shopping. She also noticed he had a large
bag with him. Wallace later watched Silva take five or six items into a dressing room. 
When Silva came out of the dressing room, his bag appeared to be bigger and Wallace
thought he did not return as many items to the rack as he had taken into the dressing
room. On inspection, Wallace found two empty hangers and a nogo (anti-theft device) in
the dressing room. After talking to the assistant manager, Wallace called security. 

 Rivera testified Silva was visibly nervous and shaking when he approached him. 
Rivera said he emptied the contents of Silva's bag on a nearby shelf or counter and denied
emptying it on the floor. Rivera said Silva offered no excuse for not having a receipt for the
three shirts. Rivera testified he placed Silva in handcuffs and conducted a pat-down
search. He then took Silva to the store office to further investigate. Disputing Silva's
testimony there were a lot of people watching, Rivera described the store as a "ghost
town." Rivera testified Wallace was able to describe the items in the bag. Rivera talked
to the district attorney's office, which agreed to press charges. After an exchange of
handcuffs, Silva was turned over to the custody of the city police. Rivera denied forcing
Silva to the floor at any time. 

 An appeal from the denial of a motion for directed verdict is in essence a challenge
to the legal sufficiency of the evidence. Haynes & Boone, L.L.P. v. Chason, 81 S.W.3d
307, 309 (Tex. App.-Tyler 2001, pet. denied). In determining whether there is no evidence
of probative force to support a jury's finding, all the record evidence must be considered
in the light most favorable to the party in whose favor the verdict has been rendered, and
every reasonable inference deducible from the evidence is to be indulged in that party's
favor. Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). A no-evidence point will be sustained when (a) there is a complete absence of evidence of a
vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no
more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the
vital fact. Id. 

 When considering a factual sufficiency challenge to a jury's verdict, we must
consider and weigh all the evidence, not just that which supports the verdict. Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998). We can set aside the
verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict
is clearly wrong and unjust. Id. at 407. When we review a punitive damage award, we
must detail the relevant evidence in our opinion, explaining why that evidence either
supports or does not support the punitive damage award. Tex. Civ. Prac. & Rem. Code
Ann. § 41.013 (Vernon 1997). Factors to be considered when determining the amount of
an award of exemplary damages include (1) the nature of the wrong; (2) the character of
the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and
sensibilities of the parties concerned; (5) the extent to which such conduct offends a public
sense of justice and propriety; and (6) the net worth of the defendant. Tex. Civ. Prac. &
Rem. Code Ann. § 41.011 (Vernon 1997).

 As its first point of error, Dillard contends the trial court erred in denying its motion
for judgment notwithstanding the verdict, or alternatively, its motion for new trial, because
there was no evidence, or only factually insufficient evidence, to support the jury's finding
of false imprisonment. To prevail under a false imprisonment claim, a plaintiff must prove
(1) willful detention, (2) without consent, and (3) without authority of law. Sears, Roebuck
& Co. v. Castillo, 693 S.W.2d 374, 375 (Tex. 1985). 

 Dillard contends the third element is missing in this case. Dillard bases this
contention on the shopkeeper's privilege created by Texas Civil Practice and Remedies
Code Section 124.001. See Tex. Civ. Prac. & Rem. Code Ann. § 124.001 (Vernon 1997). 
The shopkeeper's privilege expressly grants an employee the authority of law to detain a
customer to investigate the ownership of property, so long as (1) the employee has a
reasonable belief the customer has stolen or is attempting to steal store merchandise,
(2) the detention was for a reasonable amount of time, and (3) the detention was in a
reasonable manner. Wal-Mart Stores, Inc. v. Resendez, 962 S.W.2d 539, 540 (Tex. 1998). 
Dillard asserts there was no evidence Silva's detention was unreasonable. 

 In Resendez, the plaintiff sued Wal-Mart for negligence, false imprisonment,
intentional infliction of emotional distress, and malicious prosecution. Id. The jury found
no liability based on the malicious prosecution claim. Id. Because the jury found no basis
for a malicious prosecution claim, the Texas Supreme Court held Wal-Mart's belief that
Resendez had stolen or was attempting to steal store merchandise was necessarily
reasonable. Id. In this case, the jury also found no liability based on the malicious
prosecution; therefore, we must find Dillard's belief that items were being stolen as
reasonable, as a matter of law. 

 The second component of the shopkeeper's privilege is whether the detention was
for a reasonable amount of time. Silva testified he did not know the length of time he was
detained by Dillard. The last receipt obtained from Dillard by Silva was marked 1:31 p.m. 
Wallace testified she first noticed Silva around 1:30 or 1:45 p.m. She observed him for
about fifteen minutes until he went into a dressing room for five or six minutes. Shortly
after this, Silva was approached by Rivera and taken upstairs. The police report denotes
the patrol officers arrived on the scene at 3:23 p.m. to transport Silva to jail. 

 Dillard contends the evidence shows Silva was detained for approximately one hour,
perhaps a little longer. Silva agrees the detention lasted an hour or so. Dillard contends
that, even if the detention was longer than an hour, there was no evidence this was an
unreasonable amount of time for Rivera to question Silva and the store employees, and
to talk with officers at the police department and prosecutors at the district attorney's office. 

 In Resendez, the court held the ten to fifteen minutes in that case was not
unreasonable as a matter of law. Id. The court, however, made its decision "[w]ithout
deciding the outer parameters of a permissible period of time under section 124.001." Id. 
Here, both sides agree the detention was for at least an hour. Considering the totality of
the circumstances, we cannot say Silva was detained for an unreasonable length of time. 

 The third component of the shopkeeper's privilege is whether the detention was in
a reasonable manner. Again, Dillard contends there was no evidence the detention was
not reasonable. Silva testified, however, that Rivera accused him of theft and placed him
on the floor and handcuffed him. Silva said the officer emptied Silva's shopping bag onto
the floor. Silva testified people were around him when he was taken upstairs in handcuffs
and when he was later escorted to the police car. He further stated the officer and a
woman made fun of him while he was being detained upstairs. Silva stated that, when the
city police came to take him into custody, Rivera again placed him on the floor with his
knee in his back and exchanged handcuffs with the city police. He further testified that he
asked Rivera many times to check his car for the receipt, but these requests were ignored
and that, during the entire time he was detained, no one asked him for any explanation. 
Dillard, on the other hand, points to Rivera's testimony, which "flatly contradicted Mr. Silva
at every turn." 

 Silva's testimony provided the jury with evidence the detention was not conducted
in a reasonable manner. Although the descriptions of the detention by Silva and Rivera
were different, when parties introduce conflicting testimony in a jury trial, it is the duty of
the jury to determine which witness is more credible. Jones v. Tarrant Util. Co., 638
S.W.2d 862, 866 (Tex. 1982). The verdict indicates the jury found Silva's story more
credible than Rivera's. 

 Generally, the reasonableness of a detention is a question of fact for the jury to
decide. See Wal-Mart Stores, Inc. v. Odem, 929 S.W.2d 513, 520 (Tex. App.-San Antonio
1996, writ denied). Silva's testimony was more than a scintilla of evidence to support the
jury's finding, and its verdict was not so contrary to the overwhelming weight of the
evidence that it was clearly wrong and unjust. Dillard's first point of error is overruled.

 Dillard next contends the trial court erred in denying its motion for judgment
notwithstanding the verdict or, alternatively, its motion for new trial, because there was no
evidence, or only factually insufficient evidence, to support the jury's finding of intentional
infliction of emotional distress. To prevail under an intentional infliction of emotional
distress claim, a plaintiff must prove four elements: (1) the defendant acted intentionally
or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's
actions caused the plaintiff emotional distress; and (4) the emotional distress was severe. 
Morgan v. Anthony, 27 S.W.3d 928, 929 (Tex. 2000).

 When the Texas Supreme Court recognized the tort of intentional infliction of
emotional distress, it specifically pointed out its trust for juries to resolve factual disputes
giving rise to this tort. Twyman v. Twyman, 855 S.W.2d 619, 622 (Tex. 1993). With
respect to a defendant's intent, a jury is free to discredit the defendant's protestations that
no harm was intended and to draw necessary inferences to establish intent. Id. at 623. 
With respect to recklessness, a jury may find a defendant acted recklessly if "he knows or
has reason to know . . . of facts which create a high degree of risk of . . . harm to another,
and deliberately proceeds to act, or fails to act, in conscious disregard of, or indifference
to that risk." Id. at 624. 

 Whether a defendant's conduct may reasonably be regarded as extreme and
outrageous, however, is a question of law. Wornick Co. v. Casas, 856 S.W.2d 732, 734
(Tex. 1993). Liability for outrageous conduct should be found only where the conduct has
been so outrageous in character, and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized
community. Twyman, 855 S.W.2d at 621.

 The Texas Supreme Court has greatly limited the availability of the tort of intentional
infliction of emotional distress by holding that such tort is available only in those situations
in which severe emotional distress is the intended consequence or primary risk of the
actor's conduct. Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62, 67 (Tex.
1998). Redress for this tort is available only when the tortfeasor desired or anticipated the
plaintiff would suffer severe emotional distress. Id. Where emotional distress is solely
derivative of or incidental to the intended or most likely consequence of the actor's conduct,
recovery for such distress must be had, if at all, under some other tort doctrine. Id. A
claim for intentional infliction of emotional distress cannot be maintained when the risk that
emotional distress will result is merely incidental to the commission of some other tort. Id.
at 68.

 Silva points to the following facts as evidence of Dillard's outrageous conduct: Silva
was handcuffed, placed on the floor in front of other people, had his shopping bag dumped
on the floor, was made fun of by Dillard's employees, was placed on the floor again while
the handcuffs were exchanged, and was taken through a line of onlookers on his way to
the police car. Silva also contends the most important evidence of Dillard's extreme and
outrageous conduct is the fact "Dillard's knew before Mr. Silva was criminally prosecuted
that Mr. Silva had done absolutely nothing wrong!" In support of his contention that Dillard
knew of his innocence before his criminal trial began, Silva points to evidence that Dillard
was shown the receipt for the shirts and was shown the photograph (taken at the salon)
of him with the shirts. Silva contends:

 To subject a human being whom they knew to be innocent to potential
liability of up to 180 eighty [sic] days in jail and a $2,000.00 fine when a
simple telephone call would have ended the entire matter is outrageous,
extreme in the degree, atrocious, utterly intolerable, and clearly goes beyond
all bounds of decency.

 

 Despite Silva's contention Dillard knew of his innocence at the time of his criminal
trial, the jury found Dillard had probable cause to initiate criminal proceedings against him. 
This is evidenced by the jury's finding Dillard not liable on Silva's claim of malicious
prosecution. Therefore, the fact Dillard initiated criminal proceedings against Silva cannot
constitute outrageous behavior. 

 The remaining actions by Dillard that Silva contends were extreme and outrageous
were derivative of or incidental to Dillard's conduct in committing the tort of false
imprisonment. Therefore, recovery by Silva for his distress resulting from such conduct
must be had, if at all, under that tort doctrine. See id. at 67. Dillard's second point of error
is sustained. As its third point of error, Dillard contends the trial court erred in denying its motion
for judgment notwithstanding the verdict or, alternatively, its motion for new trial, because
there was no evidence, or only factually insufficient evidence, to support the jury's finding
of negligence. To prevail under a negligence claim, a plaintiff must show (1) a legal duty,
(2) a breach of that duty, and (3) damages proximately caused by the breach. Van Horn
v. Chambers, 970 S.W.2d 542, 544 (Tex. 1998). 

 Silva contends that all of the following evidence supports the jury's finding of
negligence on the part of Dillard: 

 1. The "obvious" incompetence of Wallace, the store clerk who testified
she witnessed Silva stealing;


 2. Dillard's negligence in hiring Wallace, when Wallace lied on her
resume by stating she had completed seventy-two credit hours at the
University of Texas, and when Wallace's only training in loss prevention
consisted of viewing a videotape;


 3. Wallace's negligence in making the initial report to Rivera that Silva
had stolen something; and


 4. Dillard's failure to investigate Silva's repeated claims of innocence
(both at the time of the incident and before the criminal trial when Dillard was
presented with alleged proof of his innocence).


 Dillard contends Silva alleged negligence in his pleadings in only two respects: the
hiring of Wallace, the sales associate who reported the suspected shoplifting, and Dillard's
failure to institute store policies to prevent these types of occurrences. Dillard
acknowledges an employer has a duty to adequately supervise and train its employees.
See Allen v. A & T Transp. Co., 79 S.W.3d 65, 70 (Tex. App.-Texarkana 2002, pet.
denied). But, Dillard maintains any judgment based on negligent supervision or training
cannot be supported by Silva's pleadings. See Tex. R. Civ. P. 301. We agree with Dillard's
reading of Silva's pleadings. Because Silva is limited to the types of negligence alleged
in his pleadings, we cannot affirm any finding of negligence based on negligent training or
supervision of Dillard's employees. We therefore will limit our discussion to negligence
based on what Silva alleged was Dillard's negligent hiring of Wallace and Dillard's failure
to implement proper security procedures. 

 Silva offered no evidence to show Wallace was incompetent or that Dillard was
negligent in hiring her. Silva blames Wallace for what happened to him because she is the
one who started the incident by reporting her suspicions. Silva relies on being found not
guilty at the resulting criminal trial to prove she was unfit for her job. However, as noted
earlier, the jury found Dillard was not liable with respect to the claim of malicious
prosecution. Moreover, when the jury was asked to assign percentages concerning the
amount of contributory negligence attributable to Wallace, Dillard, and Silva, the jury found
Dillard sixty percent at fault and Silva forty percent at fault, but attributed no fault to
Wallace. Because the jury found Wallace was not negligent in this case, Dillard was not
negligent in hiring her with respect to the same facts. 

 As to Dillard's procedures, the following portions of Dillard's manual of rules and
procedures were read into the record by Rivera: 

 "Apprehension. Number One, The person must be observed in the actual
removal and/or concealment of merchandise. If merchandise is being taken
into a fitting room he must establish concealment by observing customer and
merchandise count and description taken into and from the fitting room."


 . . . .


 [Number Two:] "Where possible constant observation of the suspect must
be maintained by you, the security officer, or Dillard associates until the
apprehension is made."


 . . . .


 [Number Three:] "Usually and unless local laws permit otherwise the
suspect must be permitted to exit the premises prior to apprehension."


 . . . .


 Investigation number one: "You must act in a professional manner at all
times."


 . . . .


 No. 2, "Touching suspect in any manner should be avoided unless it
becomes necessary to maintain order in the particular situation. Handcuffs
should not be used unless suspect poses threat to customers or your own
personnel."


 . . . .


 Number Three: "You may detain a suspect for a reasonable amount of time
in order to conduct a reasonable investigation. If you determine there was
no crime committed, terminate the contact with the customer and apologize
for the inconvenience. If the customer wishes to make a complaint, refer
them to the manager only."


 Additional evidence from the rules and procedures manual showed it was Dillard's
policy for the security personnel to prepare thorough investigation reports of any incident
and to retain any evidence from the incident in a secured area, with all sales or price tags
kept as if the merchandise was to be returned to the floor. The record also contained
evidence that Dillard showed its employees a videotape about store security at the time
they were hired. Moreover, the testimony showed that, before Wallace called Rivera to
report her suspicions, she called her supervisor, who then instructed her to call security. 

 Silva argues inadequate procedures, but fails to identify those particular procedures
he deems inadequate. We find from the evidence that Dillard did have and implemented
adequate procedures. Dillard's third point of error is sustained. 

 Dillard next contends the trial court erred in denying its motion for judgment
notwithstanding the verdict or, alternatively, its motion for new trial, because there was no
evidence, or only factually insufficient evidence, to support the jury's actual damages
award. 

 In addressing damages, the jury was instructed to consider the following elements: 
physical pain and mental anguish, attorney's fees incurred in the original criminal
proceeding, and attorney's fees in the expunction proceeding. Considering those four
things, the jury was then asked to fill in a dollar amount for past damages and for future
damages. The jury answered $10,124.01 for past damages and $3,000.00 for future
damages. When a damages issue is submitted in broad-form, an appellate court cannot
ascertain with certainty what amount is attributable to each element. Excel Corp. v. Porras,
14 S.W.3d 307, 314 (Tex. App.-Corpus Christi 1999, pet. denied).

 Dillard contests these awards because they are based, at least in part, on Silva's
past and future legal expenses in connection with the criminal proceeding instituted against
him for which Dillard was found not liable. Dillard also contends the record is totally devoid
of any evidence to support an award for physical pain. We agree. However, because this
was a broad-form question which allowed the jury to provide a single answer for Silva's
physical pain and mental anguish, and his past legal fees, we still must address whether
there was evidence of mental anguish. 

 In order to recover for mental anguish, a plaintiff must offer either direct evidence
of the nature, duration, or severity of his or her anguish, thus establishing a substantial
disruption in the plaintiff's daily routine, or other evidence of a high degree of mental pain
and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. 
Saenz v. Fid. & Guar. Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996). Mental
anguish does include mental sensation of pain resulting from such painful emotions as
grief, severe disappointment, indignation, wounded pride, shame, despair, and/or public
humiliation. McLure v. Tiller, 63 S.W.3d 72, 84 (Tex. App.-El Paso 2001, pet. filed). 
Recovery is warranted in such cases where the plaintiff's mental pain has risen to such a
level that it has rendered him or her incapable of dealing with certain everyday activities. 
Id. For instance, as a result of the mental pain, the plaintiff suffers from a myriad of
negative emotions; some of these emotions may manifest themselves in such a way as to
make it difficult for the plaintiff to eat, sleep, work, socially interact, or carry on any other
activity which, until the time of the alleged injury, he or she could accomplish on a day-to-day basis without difficulty. Id. 

 In this case, there was evidence that the incident had affected Silva in a greater way
than mere worry, anxiety, vexation, embarrassment, or anger. Several witnesses testified
that before the incident Silva was always happy, but after the incident his personality
changed. Silva's roommate testified Silva experienced nightmares as a result of the
incident. He testified Silva would cry about what had happened to him. There was
testimony of activities that Silva enjoyed before this incident, such as shopping and
dancing, that he no longer likes to do. Silva testified he suffered from depression because
of this incident. He further testified this incident caused him to lose his pride, "his dignity
[as] a citizen." This evidence is sufficient to support the jury's award of past and future
damages for mental anguish. Because the damages question submitted to the jury was
broad, evidence to support one of the elements is enough to support recovery of the
award. Dillard's fourth point of error is overruled.

 Dillard also contends the trial court erred in denying its motion for judgment
notwithstanding the verdict or, alternatively, its motion for new trial, because there was no
evidence, or only factually insufficient evidence, to support the jury's punitive damage
award. The jury found Dillard's conduct resulted from malice and awarded $50,000.00 in
punitive damages. 

 To recover exemplary damages in this case, Silva was required to prove by clear
and convincing evidence that the harm suffered resulted from malice. See Tex. Civ. Prac.
& Rem. Code Ann. § 41.003(a)(2) (Vernon 1997). Malice means a specific intent by the
defendant to cause substantial injury to the claimant; or an act or omission which, when
viewed objectively from the standpoint of the actor at the time of its occurrence, involved
an extreme degree of risk, considering the probability and magnitude of the potential harm
to others, and of which the actor had actual, subjective awareness of the risk involved, but
nevertheless proceeded with conscious indifference to the rights, safety, or welfare of
others. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (Vernon 1997). 

 The determination of whether to award exemplary damages and the amount of
exemplary damages to be awarded is within the discretion of the trier of fact. Tex. Civ.
Prac. & Rem. Code Ann. § 41.010 (Vernon 1997). We are not free to reweigh the
evidence and set aside a jury's verdict merely because we feel a different result is more
reasonable. Ellis County State Bank v. Keever, 936 S.W.2d 683, 685 (Tex. App.-Dallas
1996, no writ). 

 The dissent contends the evidence is legally insufficient to sustain the punitive
damage award and asserts support for that position in the jury's finding that Dillard did not
maliciously prosecute Silva. The trial court, however, was careful to instruct the jury that
the definition of "malice" given in that question applied only "in this specific question." 
Likewise, in submitting the predicate question for punitive damages, the court instructed
the jury to apply the statutory definition of "malice" in that question only "as used in this
specific question." In applying those two definitions of "malice," it was not inconsistent-as
implied by the dissent-for the jury to find that Dillard maliciously caused harm to Silva in
its unreasonable detention of him, and also find that Dillard did not maliciously prosecute
him. 

 The dissent also contends the jury's finding that Silva was contributorily negligent
supports the position that the evidence is legally insufficient to sustain the punitive damage
award and concludes Silva had been adequately compensated by the actual damages the
jury awarded.

 It should be noted we have held against Silva on his negligence theory of recovery. 
But, even if we had held otherwise, the dissent's position is untenable because the
comparative negligence statute does not bar recovery of punitive damages. Anderson v.
Trent, 685 S.W.2d 712 (Tex. App-Dallas 1984, writ ref'd n.r.e.). In Anderson, the Dallas
court wrote:

 [T]he paramount purpose for awarding exemplary damages is not to
compensate the plaintiff, but to punish and set an example for others.
Consequently, it is incorrect to view the award of exemplary damages from
the eyes of the recovering plaintiff; rather, the award should be viewed from
the eyes of public policy. 


Id. at 714 (citations omitted).


 We find that the evidence supporting the punitive damage award in the instant case 
is legally and factually sufficient and, viewed "from the eyes of public policy," it is not
excessive. When considering whether punitive damages are excessive, we must consider: 
(1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of
culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and
(5) the extent to which such conduct offends a public sense of justice and propriety. Alamo
Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981). 

 Here, the nature of the wrong was the emotional harm Silva sustained as a result
of this incident at Dillard. Silva's personality changed after the incident. He no longer liked
to do the same things, like shopping and dancing, that he enjoyed before the incident. 
Silva experienced nightmares and testified this incident at Dillard caused him to be
depressed. Silva's roommate testified about Silva crying. Silva also lost weight and sleep
because of this incident. He said he could not face his friends or do his work. He said this
incident caused him to lose "his dignity [as] a citizen."

 The character of the conduct involved and the degree of the wrongdoer's culpability
refer to evidence of Dillard's state of mind, the degree of its conscious indifference, and
any malice in its actions. See Keever, 936 S.W.2d at 687. The jury was instructed that
malice means a specific intent by Dillard to cause substantial injury to Silva; or an act or
omission by Dillard, which when viewed objectively from Dillard's standpoint at the time of
its occurrence, involved an extreme degree of risk, considering the probability and
magnitude of the potential harm to others; and of which Dillard had actual, subjective
awareness of the risk involved, but nevertheless proceeded with conscious indifference to
the rights, safety, or welfare of others. Under this definition, the jury concluded Dillard
acted with malice. Although Rivera and Silva told different versions of what happened, it
was up to the jury to decide which version of events to believe. See Jones, 638 S.W.2d
at 866. 

 Silva testified Rivera prevented him from taking medication for a migraine headache,
handcuffed him, placed him on the floor in front of other people, dumped his shopping bag
on the floor, made fun of him as he sat in the office, placed him on the floor again while the
handcuffs were exchanged, put his knee in his back, and then took him through a line of
onlookers on the way to a waiting police car. Silva further testified that no one asked him
for an explanation and that he told Rivera many times he had receipts for everything. 
While being led to the police car, Silva was crying and still begging to be allowed to go to
his car for the receipts. 

 The situation and sensibilities of the parties concerned refers to evidence of such
things as remorse, remedial measures, and ability to pay the punitive damages. Keever,
936 S.W.2d at 688. There was no remorse on the part of Dillard evidenced in the record. 
Dillard still denies the incident took place as Silva described. There was evidence Rivera
no longer works for Dillard; however, he testified this had nothing to do with his handling
of this incident, and no controverting evidence was introduced. 

 Finally, we examine the evidence in light of the extent to which the conduct offends
a public sense of justice and propriety. We conclude a rational jury could have found
Dillard's behavior in this incident offended the public sense of justice and propriety. See
Rice Food Mkts., Inc. v. Ramirez, 59 S.W.3d 726 (Tex. App.-Amarillo 2001, no pet.). 
Dillard's fifth point of error is overruled. 

 We reverse the judgment to the extent it adjudges Dillard liable for intentional
infliction of emotional stress or for negligence. We affirm the judgment in all other
respects.


 Donald R. Ross

 Justice











 


DISSENTING OPINION

 I do not believe the evidence is legally sufficient to sustain the punitive damage
award.

 To support exemplary damages, a plaintiff must prove by clear and convincing
evidence that the harm resulted from malice. The first prong of malice requires proof of
an act or omission that involved an extreme degree of risk. Tex. Civ. Prac. & Rem. Code
Ann. § 41.001(7)(B)(i) (Vernon 1997).

 This Court has previously stated that Moriel explains that the harm to be anticipated
from the conduct must be extraordinary harm, which is further described as "death,
grievous physical injury, or financial ruin." Celanese Ltd. v. Chem. Waste Mgmt., Inc., 75
S.W.3d 593, 600 (Tex. App.-Texarkana 2002, pet. denied) (citing Transp. Ins. Co. v.
Moriel, 879 S.W.2d 10, 24 (Tex. 1994)). An extreme degree of risk is required. A remote
possibility does not meet the test, and the conduct must create a likelihood of serious
injury. Universal Servs. Co. v. Ung, 904 S.W.2d 638, 641 (Tex. 1995). Exemplary
damages are available for the purpose of punishing a defendant for outrageous, malicious,
or otherwise morally culpable conduct. Celanese Ltd., 75 S.W.3d at 600. The extreme
degree of risk factor is a significantly higher standard than the reasonable person test for
ordinary negligence. Moriel, 879 S.W.2d at 22. To determine if acts or omissions involve
extreme risks, we must analyze the events and circumstances from the defendant's
perspective at the time the harm occurred, without resorting to hindsight.  Id. at 23. An
extreme risk of harm is a function of both the magnitude and the probability of the
anticipated injury to the plaintiff. The extreme risk prong is not satisfied by a remote
possibility or injury or even a high probability of minor harm, but rather the likelihood of
serious injury to the plaintiff. Id. at 22. This objective element is the distinguishing feature
between conduct which is deserving of punishment and that which merely demands
restitution.  Wal-Mart Stores, Inc. v. Alexander, 868 S.W.2d 322, 326 (Tex. 1993).

 In analyzing this matter from the defendant's perspective at the time, as we are
required to do, without resorting to hindsight, it cannot be said that the defendant created
an extreme degree of risk by its actions. By statute, Dillard Department Stores, Inc. is
authorized to detain persons it reasonably believes have stolen or are attempting to steal
property in a reasonable manner and for a reasonable time to investigate ownership of the
property. Tex. Civ. Prac. & Rem. Code Ann. § 124.001 (Vernon 1997). The jury found that
such detention was not reasonable and awarded Lyndon Silva damages he incurred. 
However, the jury also found that Dillard did not maliciously prosecute Silva after being
instructed in that question that malice meant "ill will, bad or evil motive, or such gross
indifference to the rights of others as to amount to a willful or wanton act." Silva was found
negligent, and the jury attributed forty percent of the cause of the occurrence to him. The
question in this case is did Dillard's actions rise to the level of outrageous, malicious, or
otherwise morally culpable conduct which should be punished. Ellis County State Bank
v. Keever, 936 S.W.2d 683 (Tex. App.-Dallas 1996, no writ).

 Viewed in the light most favorable to Silva, the evidence shows Silva was suspected
of shoplifting, detained, handcuffed, placed on the floor, and taken to a police car as
onlookers watched. This action does not pose such an extreme degree of risk as to create
a likelihood of serious injury. It is rather, at most, conduct that the law considers wrong,
but not a "most exceptional case."

 The jury awarded Silva damages for physical pain and mental anguish in the past
and in reasonable probability will be sustained in the future and attorney's fees in the total
sum of $13,124.01. These damages recompense Silva. 

 However, "[t]o be malicious, the act not only must be unlawful, but it must also be
of a wanton and malicious nature, or somewhat of a criminal or wanton nature. Whereas
every tort involves conduct that the law considers wrong, punitive damages are proper only
in the most exceptional of cases." C & D Robotics, Inc. v. Mann, 47 S.W.3d 194, 201 (Tex.
App.-Texarkana 2001, no pet.) (citing Moriel, 879 S.W.2d at 18). There is no more than
a scintilla of evidence in the record supporting a finding that Dillard created an extreme
degree of risk of serious injury of such magnitude as to be deserving of punishment. 

 Likewise, I do not believe there is any clear and convincing evidence that Dillard was
consciously indifferent to Silva's rights or welfare. Silva argues that the "most important"
evidence of Dillard's conscious indifference is its failure to ask the State to dismiss charges
against Silva. However, the jury absolved Dillard of any liability for malicious prosecution.

 Based on the above, I do not believe that there is legally sufficient evidence to
conclude clearly and convincingly that Silva suffered harm as a result of malice. I concur
in all other portions of the opinion.




 Jack Carter

 Justice


Date Submitted: February 19, 2003

Date Decided: May 13, 2003

1. Silva's receipt was for the following three SKU numbers: (1) 580-507 179604,
(2) 580-507 179604, and (3) 765 460 072861. Dillard's civil recovery information report
had recorded the numbers from the shirts as: (1) 580 507 0179604, (2) 580 507 0179606,
and (3) 765 460 072874. 


d 653, 660 (Tex. App.Texarkana 2005, no pet.).  Egregious harm occurs where an error affects
the very basis of a case, deprives the defendant of a valuable right, vitally
affects a defensive theory, or makes the case for conviction or punishment
clearly and significantly more persuasive.  Boones,
170 S.W.3d at 660 (citing Saunders v.
State, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).  This is a difficult standard to prove, and it
must be determined on a case-by-case basis.  Ellison
v. State, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002).  The actual degree of harm must be assayed in
light of the entire jury charge, the state of the evidence, including the
contested issues and weight of probative evidence, the argument of counsel and
any other relevant information revealed by the record of the trial as a whole.
 Almanza,
686 S.W.2d at 171.

            Non-accomplice
evidence can render harmless a failure to submit an accomplice witness
instruction by fulfilling the purpose an accomplice witness instruction is
designed to serve.  Herron, 86 S.W.3d at 632.  Under
the egregious harm standard, the omission of an accomplice witness instruction
is generally harmless unless the corroborating (nonaccomplice) evidence is so
unconvincing in fact as to render the States overall case for conviction
clearly and significantly less persuasive.  Id.

            Here, beyond
the testimony of the two accomplices, as referenced above, we have McNabbs
photographs, video recordings, and audio narration that effectively confessed
to the arson.  The evidence at McNabbs
trial also included testimony from Britton Podzymeny from whose front
porchacross the street from the burning schoolMcNabb, McKinley, and Murray
watched the fire; Podzymeny testified that the three appeared enthused, I mean
excited to see the fire and that there was a cigarette lighter present at the
time. 

            Also,
Chief Reginald Cooper testified that McNabbs statements during his interview
did not comport with Coopers investigation. 
For example, McNabb claimed he had repeated his version of events of
that day to several people who could corroborate his tale.  However, Cooper was unable to locate anyone
that would support McNabbs rendition of the story.  McNabb claimed that he had been living with
Stephen and Toni Jones, but could not tell Cooper how he could find them in
order for Cooper to question the Joneses. 
Cooper also told the jury that text messages from McNabbs cell phone
led him to believe McNabb was trying to set up a false alibi.  He testified, Chelsie Cocoa was the friend
that Mr. McNabb mentioned that could corroborate his story.  The first text message to Cocoa from McNabbs
cell phone was [Murray] told them I did it. 
Theyre going to call you and ask you if I told you [Murray] did it,
that it got lit twice and that I blew it out the first time.  Cocoa texted back, Wow.  What do I say?, and McNabb replied, We will
go over everything when you get out of school. 
Just dont talk to them until then.[3]

            All that
evidence tended to connect McNabb to the commission of the arson.  Simmons
v. State, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).  We do not find that the nonaccomplice-witness
evidencethe cell phone evidence, paired with Podzymenys and Coopers
testimonywas so unconvincing in fact as to render the States overall case
for conviction clearly and significantly less persuasive.  Herron, 86 S.W.3d at
632.  McNabb has failed to demonstrate
that the omission of the accomplice-witness instruction caused egregious
harm.  This point is overruled.

(2)        The Jury Instruction on the Law of
Parties Was Not Erroneous

 

            The trial
courts charge during guilt/innocence instructed the jury that:  All persons are parties to an offense who
are guilty of acting together in the commission of an offense.[4]  McNabb argues on appeal[5]
that this instruction presumes that persons acting together . . . are
guilty.  Only [Murray] had pled guilty .
. . . The underscored language lessens the burden of proof for the State.  The State argues that the complained-of
instruction is a very general statement of what an accomplice is, someone
guilty of acting together to commit an offense.  We agree. 
See Prystash v. State, 3
S.W.3d 522, 542 n.1 (Tex. Crim. App. 1999) (finding identical instruction in
line with Chapter 7 of Texas Penal Code).
 One who acts together [with
another] in the commission of an offense will usually be a party under
sections 7.01 and 7.02 of the Penal Code. 
Rushing v. State, 962 S.W.2d
100, 101 (Tex. App.Houston [1st Dist.] 1997, pet. refd) (finding no error in
trial courts overruling of defendants objection to identical instruction).  We
have stated, with respect to identical instructions, that such a charge adequately
informed the jury that it was to determine whether [a defendant] was guilty as
a party to the offense.  Richbourg v. State, No. 06-00-00095-CR,
2001 WL 476510, at *12 (Tex. App.Texarkana May 8, 2001, pet. refd) (mem.
op., not designated for publication). 
Accordingly, the trial courts submission of the complained-of sentence
was not erroneous.  We overrule this
issue.

(3)        Alleged Noncompliance with Article 36.27
Was Not Preserved

 

            After reading the jurys verdict
on guilt/innocence, the trial court made the following statement:

Obviously,
you are through with your portion of this process.  I can tell you on the front end, how
appreciative we are of your time and service. 
And it is obvious that you put some time to this matter as reflected by
the time that you have been out on deliberation and the note that you sent out
to the Court and everything.

 

The clerks record does not
contain any jury note or response by the trial court if one was made.  No further reference is made to the note in
the reporters record.  McNabb argues
that the trial courts failure to include the note in the record constituted
noncompliance with Article 36.27 of the Texas Code of Criminal Procedure,[6]
and that the error was fundamental.  We
have previously held that failure to object or bring the error to the trial
courts attention fails to preserve any alleged noncompliance with Article
36.27.  Villarreal v. State, 205 S.W.3d 103, 10506 n.2 (Tex.
App.Texarkana 2006, pet. dismd, untimely filed); Hudson v. State, 128 S.W.3d 367, 377 (Tex. App.Texarkana 2004, no
pet.); Talley v. State, 909 S.W.2d
233, 235 (Tex. App.Texarkana 1995, pet. refd).  This is because we presume the trial court
acted in a manner consistent with the statute. 
Green v. State, 912 S.W.2d
189, 192 (Tex. Crim. App. 1995); Talley,
909 S.W.2d at 235.  The Texas Court of
Criminal Appeals has held that, [s]ince we presume the trial courts response
was in open court and in appellants presence, we also presume appellant agreed
to it.  Therefore, appellant waived any
error, and the Almanza standard is
inapplicable.  Green, 912 S.W.2d at 193.

            Here,
because McNabb failed to object to alleged noncompliance with Article 36.27 of
the Texas Code of Criminal Procedure, he has failed to preserve this issue for
review.  We overrule this issue.[7]

            We affirm the trial courts
judgment.

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          June
8, 2011    

Date Decided:             June
10, 2011

 

Do Not Publish

 

 

 

 

 











[1]After
attending a GED class, McKinley and Murray paid a visit to McNabb.  The trio decided to walk to the park to smoke
marihuana.  On the way, they stopped at the
old school, which they referred to as the [p]ink prison.  Thereafter, the group walked to the park,
smoked marihuana, and returned to the school while high on the drug. McKinley
and Murray testified that McNabb lit a broken door with a lighter, but that
Murray blew it out and said to McNabb, I did not want this on my
record.  McKinley and Murray left the
building; McNabb was the last to leave. 
Murray assumed McNabb was lighting [the door] again.  Afterward, the group ran through the woods
because they were getting away from the building in case it [did] catch fire
again.  Five minutes later, the trio saw
smoke rising from the building, prompting Murray to call law enforcement to
report the fire. 





[2]McNabb
does not argue that the evidence was insufficient to convict him absent
McKinleys and Murrays testimony. 





[3]During
sentencing, McNabb testified, The only reason that I went through with all of
this is because I did not want to take the brunt of the guilt . . . . It was
not that I was trying to duck being guilty . . . but it was the simple fact I
did not want to be the only one found guilty. 

 





[4]The
charge also included the following instructions, which McNabb does not complain
of:  A person is criminally responsible
as a party to an offense if the offense is committed by his own conduct, but the
conduct of another for which he or she is criminally responsible, or by
both.  A person is criminally responsible
for an offense committed by the conduct of another if, acting with intent to
promote or assist the commission of the offense, he or she solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense.  Mere presence alone will not
constitute one as a party to an offense. 
We also note that the first paragraph of McNabbs indictment stated that
he [w]ith intent to damage or destroy a building located at 1101 E. Houston,
start[ed] a fire, or cause[d] an explosion by igniting a fire on a door.  The second paragraph alleged McNabb did then
and there intentionally start[ed] a fire, or cause[d] an explosion, by igniting
a fire on a door, and in so doing, the defendant recklessly damaged and
destroyed a building . . . by igniting a fire in a vacant building and leaving
the building.  The Texas Court of
Criminal Appeals has held that a charge may apply the law of parties to a case
even though the State did not allege that theory in the indictment. Marable v. State, 85 S.W.3d 287, 28788
(Tex. Crim. App. 2002); Montoya v. State,
810 S.W.2d 160, 165 (Tex. Crim. App. 1989).





[5]McNabb
did not object to the submission of this instruction during trial.





[6]Jury
notes during trial are the subject of specific statutory injunction.  We quote it here:

 

When
the jury wishes to communicate with the court, it shall so notify the sheriff,
who shall inform the court thereof.  Any
communication relative to the cause must be written, prepared by the foreman
and shall be submitted to the court through the bailiff.  The court shall answer any such communication
in writing, and before giving such answer to the jury shall use reasonable
diligence to secure the presence of the defendant and his counsel, and shall
first submit the question and also submit his answer to the same to the
defendant or his counsel or objections and exceptions, in the same manner as
any other written instructions are submitted to such counsel, before the court
gives such answer to the jury, but if he is unable to secure the presence of
the defendant and his counsel, then he shall proceed to answer the same as he
deems proper.  The written instruction or
answer to the communication shall be read in open court unless expressly waived
by the defendant.

 

Tex.
Code Crim. Proc. Ann. art. 36.27 (Vernon 2006).





[7]We
also note that McNabb filed a motion to abate this appeal on April 11,
2011.  He claimed that The District
Clerks Office has been unable to locate the jury note in question.  The court reporter has copies of an unsigned,
unfiled written response by the trial judge to a jury note.  By our order of April 12, 2011, McNabbs
motion to abate was denied.  We directed
McNabb to contact the district attorney and determine whether the parties can,
by written stipulation, deliver a copy of the missing items to the clerk for
inclusion in the record.  See Tex.
R. App. P. 34.5(e).  If the
parties cannot agree, or do not have or cannot obtain a copy of those items,
counsel may refile this motion to abate, which will then be considered by the
Court in light of the situation as it has developed.  The Court has not been notified of any such
agreement between McNabb and the district attorney, and McNabb has not filed
another motion to abate.  Also, McNabbs
briefing stated, [A]ppellant must show egregious harm for relief.  Further discussion of this error will be made
pending a motion to abate this appeal and an order on remand on the trial court
to correct the record about any jury note and any judicial response there to
[sic].  The Court has received no
further briefing.